TORRUELLA, Circuit Judge
(Dissenting).
Lest we be misled by the majority’s choice of emphasis, this is not a ease about the state’s authority to disenfranchise convicted felons, nor about the popularity or desirability of that practice. Were that *46 the issue before us, I too would be in the majority, as the validity of felon disenfranchisement laws, as a general matter, has been established. See Richardson v. Ramirez, 418 U.S. 24, 56, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). Moreover, were that the issue before us, it would not have spawned reams of conflicting opinions, vigorous dissents and en banc reversals among our sister circuits.[25]
Rather this is a case about interpreting a clearly worded congressional statute, the Voting Rights Act of 1965 (‘VRA”), according to its terms, when there is no persuasive reason to do otherwise. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. -, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009) (“The Fifteenth Amendment empowers ‘Congress,’ not the [c]ourt[s], to determine in the first instance what legislation is needed to enforce it.”). It is also a case about the constitutional validity of altering the legal consequences for committing a crime, long after the crime’s completion. Because I disagree with the majority’s resolution of both of these novel issues, I respectfully dissent.
I. Voting Rights Act Claim
Section 2 of the VRA, as amended in 1982, plainly provides that “[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right ... to vote on account of race or color....” 42 U.S.C. § 1973(2)(a) (emphasis added); see also Nw. Austin, 557 U.S. -, 129 S.Ct. 2504, 2508. Notably, § 2(a) employs a “ ‘results’ ” test, under which proof of discriminatory intent is not necessary to establish a violation of the section. Chisom v. Roemer, 501 U.S. 380, 395, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Rather, plaintiffs can state a § 2 claim by showing that under the “totality of circumstances,” a “certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Thornburg v. Gingles, 478 U.S. 30, 43-44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[26] The allegations in plaintiffs’ com *47 plaint, which we must accept as true at this preliminary stage, see Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 , (1st Cir.2008), are that Massachusetts’ Article 120, which disqualifies incarcerated felons from voting in the Commonwealth, has a disproportionately adverse effect on the voting rights of African-Americans and Hispanic-Americans, who are over-represented in the incarcerated felon population. Plaintiffs allege that this disparate impact is caused, in part, by racial and ethnic bias in the Massachusetts court system, and operates to deny these racial minorities the right to vote, in violation of § 2 of the VRA. Plaintiffs further allege that when enacting Article 120, Massachusetts legislators were aware of the data regarding racial bias in the criminal justice system.[27]
The felon disenfranchisement provision at issue is clearly a “voting qualification.” Whether or not this provision results in the denial of the right to vote “on account of race or color” under the “totality of the circumstances” remains the ultimate question for the trier of fact. But “[e]ven if serious problems lie ahead in applying the ‘totality’ of the circumstances standard described in [VRA] § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.” Chisom, 501 U.S. at 403, 111 S.Ct. 2354. Plaintiffs have stated a claim sufficient to preclude dismissal at this preliminary stage and are entitled to the opportunity to develop it.
In order to avoid this obvious result, the majority makes an expansive and unwarranted holding. It holds that despite the broad language of VRA § 2, covering all “voting qualifications,” Congress actually never intended for felon disenfranchisement laws, even discriminatory ones, to be challengeable under that provision. It does so by disregarding the plain and unambiguous text of the statute and resorting to a collection of secondary evidence, none of which stand for the proposition the majority seeks to establish. In the face of so startling a holding, I am left wondering, in the words of Judge Calabresi, “[w]hat is behind this remarkable decision to buck text, context, and legislative history in order to insulate a particular racially discriminatory practice from an anti-discrimination rule of general applicability?” Hayden, 449 F.3d at 365 (Calabresi, J., dissenting).
The fatal flaw in the majority’s reasoning begins with its improper reliance on legislative history given the plain and unambiguous language of § 2(a)', the section of the VRA governing the central “applicability” question before us. See Robinson *48 v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (“Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.” (emphasis added)). The plain language of § 2(a) unambiguously applies to all “voting qualifications.” 42 U.S.C. § 1973. A provision disqualifying incarcerated felons, listed among the provisions of the Massachusetts Constitution governing qualifications to vote, clearly constitutes a “voting qualification.” Therefore, where it is alleged, as here, that this “qualification” is being applied “in a manner which results” in the denial of the right to vote on account of race, a cognizable VRA claim has been stated. Id. As the text of the statute unambiguously manifests its meaning, there was no need to go any further in order to conclude that plaintiffs have stated a cognizable claim under § 2 of the VRA.
This is the reasoning upon which the Ninth Circuit decision, holding that an identical VRA claim had been stated in that Circuit, starts and ends. See Farrakhan, 338 F.3d at 1016 (“Plaintiffs claim of vote denial [resulting from Washington’s felon disenfranchisement law] is cognizable under Section 2 of the VRA because ‘Melon disenfranchisement’ is a voting qualification, and Section 2 is clear that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the VRA” (emphasis added)).[28] As Judge Sotomayor similarly explained in her powerful dissenting opinion in Hayden:
It is plain to anyone reading the Voting Rights Act that it applies to all ‘voting qualifications.’ And it is equally plain that [the felon disenfranchisement provision at issue] disqualifies a group of people from voting. These two propositions should constitute the entirety of our analysis.
449 F.3d at 367-68; see also Johnson, 405 F.3d at 1247 (Barkett, J., dissenting) (“[Plaintiffs’] contention that Florida’s felon disenfranchisement law effectively denies their right to vote because they are black is clearly encompassed by the plain language of the VRA.”).
The majority cannot dispute “the traditional rule that where the plain text of the statute is unmistakably clear on its face, there is no need to discuss legislative history.” Succar v. Ashcroft, 394 F.3d 8, 31 (1st Cir.2005) (Lynch, J.) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 481, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). While the majority cites Nken v. Holder, - U.S. -, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) for the general proposition that statutory interpretations turns on language as well as context, id. at 1756, neither Nken nor the case upon which it relies addressed a statute whose plain meaning is as evident and clear on its face as the one before us. In fact, contrary to the majority’s contention, even with complicated statutory schemes like the VRA, courts have not hesitated to rely on the plain language of the text, where the text plainly answers the very question before them. See, e.g., Lopez v. Monterey County, 525 U.S. 266, 278-79, 119 S.Ct. 693, 142 *49 L.Ed.2d 728 (1999); Chisom, 501 U.S. at 396, 111 S.Ct. 2354. There is simply no support in our precedent for disregarding so plain and unambiguous a statutory mandate based on nothing more than our own assumption that Congress did not mean what it said. See BedRoc Ltd., LLC, 541 U.S. at 183, 124 S.Ct. 1587 (explaining that absent ambiguity we are bound by the “preeminent canon of statutory interpretation [that] requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there” (internal quotation marks omitted)); United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175 (1932) (quoting Hamilton v. Rathbone, 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219 (1899) for proposition that legislative history may be resorted to in order “to solve, but not to create, an ambiguity” (emphasis added)); Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir.2007) (explaining that we “are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air”).
Though it is unable to point to any actual textual ambiguity, the majority nevertheless makes a conclusory assertion that “[t]he language of § 2(a) is both broad and ambiguous.” Breadth, however, does not render a statute ambiguous. See BedRoc Ltd., LLC v. United States, 541 U.S. 176, 187 n. 8, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (“Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.” (emphasis added & citation omitted)); Diamond v. Chakrabarty, 447 U.S. 303, 315, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (“Broad general language is not necessarily ambiguous when congressional objectives require broad terms.”). Rather, “a statute is ambiguous only if it admits of more than one reasonable interpretation.” United States v. Vidal-Reyes, 562 F.3d 43, 51 (1st Cir.2009) (quoting United States v. Godin, 534 F.3d 51, 56 (1st Cir.2008)). But “[c]onspicuously absent from the majority opinion is so much as a hint of an intelligible reading under which [the felon disenfranchisement provision] is not a ‘voting qualification or prerequisite to voting or standard, practice or procedure.’ (What else on earth could [the provision] possibly be?)”. Hayden, 449 F.3d at 346 (Parker, J., dissenting). There is simply no reasonable interpretation of § 2 under which a felon disenfranchisement law would not be a “voting qualification or prerequisite to voting” actionable thereunder.[29]
Given the clarity of the VRA language, which plainly encompasses the claim before us, the majority’s resort to secondary sources to justify its contrary result constitutes a “radical abandonment of our longstanding precedents that permit resort to legislative history only when necessary to interpret ambiguous statutory text.” Id. at 187 n. 8, 124 S.Ct. 1587. I cannot endorse this impermissible practice. But even if, for the sake of argument, I take up the majority’s invitation to investigate history and context, I find that none of the evidence cited by the majority indicates *50 congressional intent to exclude felon disenfranchisement laws from § 2’s purview so as to justify departing from the plain language of that provision. In fact, my reading of the legislative history is that it confirms the plain meaning of the text.
One need not delve too deeply into the legislative history to discover that Congress enacted the Voting Rights Act of 1965 pursuant to its powers to enforce the Fifteenth Amendment for the “broad remedial purpose of ‘rid[ding] the country of racial discrimination in voting.’ ” Chisom, 501 U.S. at 403, 111 S.Ct. 2354 (quoting South Carolina v. Katzenbach, 383 U.S. 301, 315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)); see also Nw. Austin, 557 U.S. -, 129 S.Ct. 2504, 2508-09.[30] At that time, although the Fifteenth Amendment guaranteeing the right to vote without regard to race or color had been in effect for nearly a hundred years, and thus, intentional discrimination was already prohibited, states continued to devise facially “neutral” devices such as gerrymandering, poll taxes, literacy tests and grandfather clauses, which, coupled with violence and intimidation, served to effectively bar minorities from access to the polls and preclude the Fifteenth Amendment’s promise of racial equality in voting from becoming a reality. See Nw. Austin, 557 U.S. -, 129 S.Ct. 2504, 2508-09 (describing “the first century of congressional enforcement of the [Fifteenth] Amendment” as a “failure” and noting the “creativity] [of states] in ‘contriving new rules’ to continue violating the Fifteenth Amendment” (quoting Katzenbach, 383 U.S. at 335, 86 S.Ct. 803)); Andrew L. Shapiro, Note, Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy, 103 Yale L.J. 537, 543 (1993). Accordingly, the text of the original § 2 “tracked, in part, the text of the Fifteenth Amendment.” Bartlett v. Strickland, — U.S. -, 129 S.Ct. 1231, 1240, 173 L.Ed.2d 173 (2009). While the legislative history of § 2 of the VRA is silent on the particular question of felon disenfranchisement, that history does clearly indicate that Congress intentionally kept § 2(a) as broad as possible because it found it “impossible to predict the variety of means that would be used to infringe on the right to vote” and wanted to encompass all such measures that states could devise. Johnson, 405 F.3d at 1243 (Wilson, J., concurring in part and dissenting in part); see also Katzenbach, 383 U.S. at 335, 86 S.Ct. 803 (noting that “Congress knew that some of the States ... had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees” and that “Congress had reason to suppose that these States might try similar maneuvers in the future”); H.R. Rep. 89-439, at 10 (1965), reprinted in 1965 U.S.C.C.A.N. 2437 (1965) (describing how, “even after defeat resisters s[ought] new ways and means of discriminating,” and, as a result, rejected the case by case approach that “too often ha[d] caused no change in result, only in methods.”). Thus, Congress intentionally chose the expansive language “voting qualifications or prerequisite to voting, or standard, practice, or procedure” for § 2 so as to be “all-inclusive of any kind of practice” that might be used by states to deny citizens that right. Allen v. State Bd. of Elections, 393 U.S. 544, 566-67, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (citing testimony from Senate Judiciary *51 Committee Hearings on the VRA).[31] As the Supreme Court has held, Congress intended the term “voting qualification” in § 2 to have the “broadest possible scope” and to reach “any state enactment which altered the election of a covered State in even a minor way.” Id., 393 U.S. at 566-67, 89 S.Ct. 817.[32]
“Criminal disenfranchisement is an outright barrier to voting that, like the poll tax and literacy test, was adopted in some states with racially discriminatory intent and has operated throughout our nation with racially discriminatory results.” Shapiro, supra, at 543.[33] Thus, these laws were precisely the type of potentially discriminatory qualification that Congress intended to subject to scrutiny under the VRA. Yet the majority definitively concludes that the VRA of 1965 was not meant to allow such an action against any felon disenfranchisement law.
The majority makes much of the fact that felon disenfranchisement was not specifically mentioned in the legislative history, but “it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute.” Harrison v. PPG Industries, Inc., 446 U.S. 578, 592, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). It is also illogical to interpret silence as intent to exclude, given that the very purpose of § 2’s broad language was to avoid reciting the various maneuvers that states *52 may devise in the course of their “unremitting and ingenious defiance.” Katzenbach, 383 U.S. at 309, 86 S.Ct. 803. Rather, the VRA subjects all voting qualifications to scrutiny. In any event, if I were to read anything into that silence, I would reach the opposite conclusion. This is because felon disenfranchisement laws, which were undoubtedly among the mechanisms being employed by states throughout the post-reconstruction era to deprive minorities of the vote,[34] were inevitably within Congress’s contemplation when drafting the VRA. Had Congress had intended to exclude this particular type of qualification from the reach of the statute, it could have done so explicitly. But Congress made no provisos to carve felon disenfranchisement laws out from the purposely “all inclusive” language of § 2(a). See Allen, 393 U.S. at 566, 89 S.Ct. 817. In this historical context, congressional silence suggests, if anything, that no such exclusion was intended.
Moreover, through the 1982 amendments to the VRA, Congress expanded the remedial power of the Act even further by relieving plaintiffs of the burden of proving discriminatory intent. Overturning a Supreme Court case that held that the original Act contained such a requirement, see Mobile v. Bolden, 446 U.S. 55, 61, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), Congress, through the 1982 amendments, made clear that a violation of § 2 could be established by proof of discriminatory results. See Thornburg, 478 U.S. at 43-44, 106 S.Ct. 2752 (emphasis added) (reading the 1982 Amendment to the VRA as effectively overturning the Bolden requirement of showing purposeful discrimination); S.Rep. No. 97-417, at 27-28, 36-37 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 204-06, 214-15 (noting that the purpose of the Amendments was to repeal Bolden and to focus the judicial inquiry only into whether there exists equal access to electoral opportunity). Congress did so because it recognized the difficulty of proving deliberate and purposeful discrimination, and sought to ensure that “in the context of all the circumstances in the jurisdiction in question,” any disparate racial impact of facially neutral voting requirements did not result from racial discrimination. S.Rep. No. 97-417 at 27. This “results test” was intended “to serve as a prophylactic against voting practices — such as felon disenfranchisement ... adopted or retained due to intentional discrimination that would be difficult to prove in court.” Daniel P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L.Rev. 689, 722 (2006). And its Report accompanying the enactment of the 1982 amendments, the Senate endorsed statements made by the Attorney General during the original VRA hearings that the purpose of “Section 2 w[as][to] ban ‘any kind of practice ... ’ if its purpose or effect was to deny or abridge the right to vote on account of race or color.” S.Rep. No. 97-417, at 17 (emphasis added). Given this history, it would be wholly incongruous with Congress’s broad ameliorative intent to conclude, as does the majority, that where the particular voter qualification that results in racial discrimination happens to be a felon disenfranchisement law, in this eventuality only, does the VRA provide no relief and permit the discriminatory qualification to persist.
To reach this unlikely result, the majority relies on assorted evidence of the widespread use and general sanction of felon disenfranchisement laws in various contexts. But all that any of this evidence actually shows is that felon disenfranchisement is not presumptively invalid, a propo *53 sition as to which, after Richardson, 418 U.S. at 56, 94 S.Ct. 2655, there is no doubt. None of the majority’s arguments support its conclusion that Congress intended to insulate such laws from scrutiny under § 2 of the VRA where they are alleged to effect a discriminatory result. Specifically, the evidence relied on by the majority includes (1) § 2 of the Fourteenth Amendment, (2) the legislative history of VRA § 4, and (3) Congressional endorsement of felon disenfranchisement generally. I will address each of these sources in turn.
A. Section 2 of the Fourteenth Amendment
The majority suggests that felon disenfranchisement somehow differs from other voting qualifications because the “power of the states to disqualify from voting those convicted of crimes is explicitly set forth in § 2 of the Fourteenth Amendment.” But, looking at the text of that provision in context, it is by no means a grant of power to states to disenfranchise felons. See U.S. Const, amend. XIV, § 2. Rather, that provision simply states that disenfranchised felons, unlike other persons disenfranchised by the States, are to be included within the census for purposes of apportioning representatives.[35]
The most that can be gleaned from this language is that by addressing the eventuality of “abridgement] ... for participation in ... crime,” Congress contemplated that at least in some circumstances, felon disenfranchisement could exist. Thus, it merely implies that there is no per se ban on such laws. But VRA § 2 is targeted at precisely those voting qualifications that are not the subject of a per se ban. See S.Rep. No. 97-417, at 16 (explaining that under § 2 as amended in 1982, “electoral devices ... per se would not be subject to attack under section 2. They would only be vulnerable, if, in the totality of circumstances, they resulted in the denial of equal access to the electoral process”). As plaintiffs do not allege that felon disenfranchisement laws are unlawful per se, but only as applied in Massachusetts, where they “result in a denial ... of the right ... to vote on account of race,” 42 U.S.C. § 1973, there is absolutely no conflict between § 2 of the Fourteenth Amendment and allowing plaintiffs to challenge disenfranchisement laws under the VRA.
In other words, that § 2 of the Fourteenth Amendment contemplates disenfranchisement as a potential qualification is unremarkable. As similarly emphasized by the majority, “[t]he criteria for eligibility to vote are defined by the states,” and states have the power to fix all kinds of qualifications for voting, disqualifying felons included, but only where the exercise of that power “do[es] not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed.” Lassiter v. Northampton County Bd. Of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959).[36] However, “[w]hile *54 a State may choose to disenfranchise some, all or none of its felons based on legitimate concerns, it may not do so based upon distinctions that have the effect, whether intentional or not, of disenfranchising felons because of their race.” Hayden, 449 F.3d at 346 (Parker, J., dissenting) (quoting Baker, 85 F.3d at 937); see also Farrakhan, 338 F.3d at 1016 (noting that although, as a general matter, “states may deprive felons of the right to vote without violating the Fourteenth Amendment, ... when felon disenfranchisement results in denial of the right to vote ... on account of race or color, Section 2 affords disenfranchised felons the means to seek redress”).
B. Legislative History of VRA § 4
To support its contention that Congress did not intend to include felon disenfranchisement laws within the scope of VRA § 2, the majority also relies on statements in the legislative history of § Jp, claiming that § I “would not result in the proscription of the frequent requirement of States ... that an applicant for voting ... be free of conviction of a felony.” S.Rep. No. 89-162 (1965), as reprinted in 1965 U.S.C.C.A.N. 2508, 2562. This argument is deeply flawed. It is error to assume that a statement about one section of a statute applies to all other sections thereof. See Hayden, 449 F.3d at 352-53 (Parker, J., dissenting) (stating that legislative history of one section of an expansive statute such as VRA is “typically of no value” when attempting to understand another, entirely different, section). In fact, the Supreme Court has explicitly warned against doing so in the VRA context. Hall, 512 U.S. at 883, 114 S.Ct. 2581 (“To be sure, if the structure and purpose of § 2 mirrored that of § 5, then the case for interpreting §§ 2 and 5 to have the same application in all cases would be convincing. But the two sections differ in structure, purpose, and application.”). This is especially true in the case before us given that the two provisions, § 2 and § 4, “differ in structure, purpose, and application.” Id. Specifically, § 4 is a provision that categorically bans, in covered jurisdictions, the use of certain facially neutral tests or devices including literacy tests, educational requirements, and “any requirement that a person as a prerequisite for voting or registration for voting ... possess good moral character.” See 42 U.S.C. § 1973b(a)(l)(A), § 1973b(c). In contrast, § 2 applies to “a broader range of practices than those ‘tests and devices’ defined in Section 4.” Johnson, 353 F.3d at 1306 n. 27. While § 4 applies only to “covered jurisdictions,” and “imposes an outright ban on tests or devices,” “§ 2(a), [applies nationally, and] creates a ‘results’ test, which requires investigating and weighing numerous factors.” Hayden, 449 F.3d at 353 (Parker, J., dissenting) (internal citation omitted); see also Nw. Austin, 557 U.S. -, 129 S.Ct. 2504, 2508 (distinguishing § 2 of the VRA, which “operates nationwide ... [to] forbid[ ] any ‘standard practice or procedure’ that ‘results in a denial or the abridgment of the right of any citizen ... to vote on account of race or color’ ” from § 4 and the remainder of the VRA which, “[r]ather than continuing to depend on case-by-case litigation ... *55 directly pre-empted the most powerful tools of black disenfranchisement in the covered areas.” (emphasis added & internal citations omitted)).
Thus, considering congressional statements about § 4 in the context of the provision at which they were addressed (§ 4), they signify nothing about the scope of what § 2 was intended to cover. Given § 4’s absolute bar on “good moral character” tests, and the natural susceptibility of “moral character” being read as a proxy for criminal history, the statements upon which the majority relies merely clarify that the categorical bar on “good moral character” tests in § 4 should not be interpreted as also an outright ban on felon disenfranchisement. See Hayden, 449 F.3d at 364-65 (Calabresi, J., dissenting) (“[S]uch legislative statements simply make the uncontroversial point that felon disenfranchisement laws are not ‘good moral character’ requirements within the meaning of § 4(c).”). In contrast, “section 2 addresses voting regulations that are not per se invalid under section 4 but nonetheless result in a racially disparate impact on voting rights.” Thomas G. Varnum, Let’s Not Jump to Conclusions: Approaching Felon Disenfranchisement Challenges Under the Voting Rights Act, 14 Mich. J. Race & L. 109, 136 (2008). Statements regarding § 4 thus provide no indication that Congress intended to insulate felon disenfranchisement laws from scrutiny under § 2 where it is alleged that the operation of a particular law results in the denial of the right to vote on account of race. See Johnson, 405 F.3d at 1249 (Barkett, J., dissenting) (noting that decision not to add felon disenfranchisement statutes to list of per se violations does not show intent to exempt these laws from the VRA); Hayden, 449 F.3d at 365 (Calabresi, J., dissenting) (“The fact that race-neutral felon disenfranchisement is permissible under § 4(c) tells us nothing at all about whether § 2 allows racially discriminatory felon disenfranchisement.” (emphasis in original)).
In support of its argument for applying § 4’s legislative history to § 2, the majority suggests that, in light of § 4’s limited applicability to “covered jurisdictions” with a history of discrimination, in contrast to § 2’s nationwide reach, Congress could not have “permitted” felon disenfranchisement laws in covered jurisdictions, while “prohibiting” them in non-covered jurisdictions like Massachusetts. But this argument similarly misses the mark, precisely because it mischaracterizes the statute. To be sure, the majority’s argument would be persuasive if § 2 categorically “prohibit[ted]” felon disenfranchisement laws in Massachusetts and other “non-covered” jurisdictions. But it does not. See S.Rep. No. 97-417, at 16. Nor does the VRA “permit” felon disenfranchisement laws, in “covered jurisdictions,” or otherwise. Rather, § 2 uniformly imposes a “totality of the circumstances” test to all “voting qualifications,” anywhere in the country, prohibiting them only in the event that they result in racial discrimination. There is nothing illogical about creating a per se ban on certain presumptively discriminatory qualifications in “covered jurisdictions” only, as was done in § 4, but also permitting scrutiny of all voting qualifications nationally, including felon disenfranchisement laws, to ensure that no particular qualification is discriminatory as applied under the particular circumstances. And that is precisely what Congress did through § 2.
By exporting the legislative history of § 4 into the § 2 context, the majority ignores the very plausible interpretation that Congress intended § 2 to include felony disenfranchisement laws precisely because it chose to exclude them from § 4’s list of categorically barred regulations. *56 While Congress did not seek to have felon disenfranchisement banned in all cases, it nevertheless intended that they be subjected, just like every other voting qualification anywhere in the country, to a “totality of the circumstances” test to assess whether they effectuate a discriminatory result The fact that members of Congress were sufficiently cognizant of felon disenfranchisement laws to carve them out from the scope of § 4, yet made no such statements in regard to § 2, despite the intentionally broad language of that provision, indicates that Congress did not in fact intend a similar restriction in the § 2 context. See Vidal-Reyes, 562 F.3d at 53 (quoting United States v. Councilman, 418 F.3d 67, 73 (1st Cir.2005)) (“ ‘[Wjhere Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.’ ”).[37] Thus, as it stands, the legislative history of § 4 shows that while Congress did not intend to enact a blanket ban on felon disenfranchisement laws as a prohibited “moral character” requirement neither did it intend to exclude discriminatory laws from the scope of VRA scrutiny.
C. Historical Legitimacy and Congressional Endorsement of Felon Disenfranchisement Law
The remainder of the arguments in the majority opinion rely on Congress’ sanctioning or presupposing the validity of felon disenfranchisement in various contexts, such as where (1) it has rejected proposals to outright bar felon disenfranchisement, either through the VRA or otherwise, and (2) endorsed disenfranchisement laws generally in the aftermath of the VRA. First of all, “subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.” Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs, 531 U.S. 159, 170 n. 5, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting Consumer Prod. Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). But more importantly, these arguments are entirely irrelevant to the question before us. Congressional refusal to pass categorical prohibitions on felon disenfranchisement or even its subsequent affirmation of the practice generally, is not inconsistent with Congress’s clear intent to subject to scrutiny, through § 2 of the VRA, “any state enactment which altered the election law of a covered State in even a minor way.” Allen, 393 U.S. at 566-67, 89 S.Ct. 817 (emphasis added). Congress may very well have decided not to bar felon disenfranchisement wholesale (as it did by omitting it from § 4) and may even have endorsed the practice where it was motivated by and served legitimate ends. But it may have nevertheless chosen, in order to make the guarantees of the Fifteenth Amendment meaningful, to restrict the adoption of this “qualification” in those cases where it is applied “in a manner which results” in the denial of the right to vote on account of race. This reading of the legislative history, which is consistent with the statutory text, is far more compelling than the majority’s analysis.
Ultimately, “the plainer the language, the more convincing contrary legislative history must be to overcome the natural purport of a statute’s language.” United *57 States v. U.S. Steel Corp., 482 F.2d 439, 444 (7th Cir.), cert. denied, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). I see a clear textual mandate, uncontradicted by any legislative history, that felon disenfranchisement laws, like all voting qualifications, may be challenged under § 2 of the VRA. “If the language of law is to have any meaning at all, then surely it must prevail over the kind of speculation that is entailed in such an enterprise as th[is] court[ ] ha[s] undertaken.” United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1355 (4th Cir.1994).
The plain language of the statute being as clear as it is, and the legislative history and purpose only bolstering that clarity, I cannot help but speculate that the majority is jumping through hoops to defeat the remedial purpose for which the provision was enacted in order to produce a result consistent with its own preference in policy. But “[t]he Fifteenth Amendment empowers ‘Congress,’ not the [c]ourt[s], to determine in the first instance what legislation is needed to enforce it.” Nw. Austin, 557 U.S. -, 129 S.Ct. at *2513. And even if we “question the wisdom of Com gress’s decision to enact a statute that permits challenging felon disenfranchisement laws, we are judges, not policy-makers.” Hayden, 449 F.3d at 348 (Parker, J., dissenting). “The duty of a judge is to follow the law, not to question its plain terms.” Id., 449 F.3d at 368 (Sotomayor, J., dissenting). “I do not believe that Congress wishes us to disregard the plain language of any statute or to invent exceptions to the statutes it has created.” Id.
Finally, I see no constitutional issues posed by interpreting the VRA according to its language and consistent with its purpose, so as to encompass felon disenfranchisement laws. Rather, § 2 of the VRA is firmly within the scope of Congress’s power to enforce the Reconstruction amendments, which includes the power to “enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter ■ unconstitutional conduct.” Nev. Dep’t of Human Res. v. Hibbs, 538 U.S. 721, 727-28, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). Finding challenges to felon disenfranchisement laws to be cognizable under the VRA, I have no trouble concluding that the' plaintiffs have stated a claim sufficient to preclude dismissal at this early juncture. Thus, I would affirm the district court’s decision on this issue.
II. Ex Post Facto Clause Claim
The second issue raised on appeal, a question of first impression in this circuit, is whether the retroactive application of a felon disenfranchisement provision violates the Ex Post Facto Clause when it is applied to felons incarcerated for crimes committed prior to the provision’s passage into law. The Ex Post Facto Clause “bars application of a law ‘that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed!)]’ ” Johnson v. United States, 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting Calder v. Bull, 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798)); see U.S. Const, art. 1, § 10 (“No State shall ... pass any ... ex post facto Law.”). Plaintiffs, incarcerated in Massachusetts for offenses committed prior to Article 120’s enactment, contend that Article 120 is unconstitutional as applied to them because it subjects them to additional punishment not provided for by the laws of the Commonwealth when they committed the acts underlying their convictions. The majority affirms the dismissal of plaintiffs’ claim on grounds that the deprivation of the right to vote, as accomplished by Article 120, does not constitute “punishment,” and thus, falls outside the protections of the Ex Post Facto Clause. I *58 cannot agree. While disenfranchising convicted felons prospectively might be perfectly constitutional, I would hold that the disenfranchisement provision here is a punitive measure, which cannot be retroactively applied.
“The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact.” Cummings v. Missouri, 4 Wall. 277, 71 U.S. 277, 320, 18 L.Ed. 356 (1866). As the majority accurately explains, analysis of whether a particular enactment imposes retroactive punishment so as to implicate the Ex Post Facto Clause requires a two-part inquiry. The first part asks whether the challenged law has a civil, regulatory purpose, or whether it is intended to punish. See Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2002) (citing Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). If a court finds that the law was intended to be punitive, then it constitutes “punishment” for purposes of the Ex Post Facto Clause and would violate the clause if retroactively applied. Id. However, if the law conveys a non-punitive, regulatory purpose, the court moves to the second part of the test to ascertain whether the law is “so punitive either in purpose or effect as to negate [the state’s] intention to deem it civil.” Id. (quoting United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). The ultimate question is “whether [Article 120] is intended to be, or by its nature necessarily is, criminal and punitive, or civil and remedial.” United States v. One Assortment of 89 Firearms, 465 U.S. 354, 362, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).
While legislative purpose is not easily discernible given the unique procedural history of Article 120’s enactment by popular referendum, I nevertheless find that a close look at the provision’s language and history reveals that it was intended by its proponents to be a primarily punitive measure. Moreover, even if the primary intent behind the enactment of Article 120 could not be clearly identified,[38] I would find this disenfranchisement law to be so punitive in effect that it nevertheless constitutes a criminal punishment under the second prong of Smith.
A. The Legislative Intent Was Punitive
We first ask whether Article 120 was intended to be a civil or criminal measure. See Smith, 538 U.S. at 92, 123 S.Ct. 1140. Determining whether Article 120 was intended to be civil or criminal “ ‘is first of all a question of statutory construction.’ ” Id. (quoting Hendricks, 521 U.S. at 361, 117 S.Ct. 2072). As this court has made clear, analysis of statutory construction “begin[s] with the language of the statute.” Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128, 139 (1st Cir.2006) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002)). Yet, in holding that Article 120 conveys a regulatory intent, the majority again departs from this well-established framework.
The majority disposes of the first prong of Smith by citing Trop v. Dulles for the proposition that “felon disenfranchisement provisions are considered regulatory rather than punitive.” See 356 U.S. 86, 94, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). But leaving aside the merits of this proposition for *59 the moment, the fact that disenfranchisement provisions are generally considered regulatory rather than punitive is not dis-positive of what the Massachusetts voters and legislators intended here. Rather, the relevant questions are what Article 120’s particular language says and if there are any inferences that can be drawn from its broader structure. See Smith, 588 U.S. at 92, 123 S.Ct. 1140 (instructing that we should first “consider the statute’s text and its structure to determine the legislative objective”). “[Considerable deference must be accorded to the intent as the legislature has stated it.” Id.
In this case, looking at the text of Article 120, there is no indication on the face of the provision of the legislative intent behind its enactment. Article 120, which was passed pursuant to a ballot question placed before Commonwealth voters, lacks any kind of express “statement of purpose” which legislation often includes, and none of its language reveals a particular government interest in felon disenfranchisement, either regulatory or punitive.[39] Instead, Article 120 merely lays out the substantive voting requirements, including the newly enacted exclusion of incarcerated felons.
Beyond the language of the provision, it is possible that the “broader structure” of the provision may provide some indication of its purpose. Id. The majority relies on the placement of Article 120 within the Commonwealth’s civil voter qualification provisions, rather than in its criminal code, to infer a regulatory purpose. But while manner of codification is certainly one factor relevant to ascertaining the nature of a provision, the Supreme Court has held that the “location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one,” or vice versa. Smith, 538 U.S. at 94, 123 S.Ct. 1140; see also Trop, 356 U.S. at 94, 78 S.Ct. 590 (“How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them! Manifestly the issue of whether [a statute] is a penal law cannot be thus determined.”). Rather, the Supreme Court instructs that “a penalty [ ] cannot be converted into [a non-penal measure] by so naming it,” and we must “ascribe to [the particular statute] the character disclosed by its purpose and operation, regardless of name.” United States v. Constantine, 296 U.S. 287, 294, 56 S.Ct. 223, 80 L.Ed. 233 (1935) (holding that even though labeled a “tax” on conducting retail liquor business, challenged statute was nevertheless a “penalty” designed to punish the violation of state liquor laws). Likewise, “even a clear legislative classification of a statute as ‘non-penal’ would not alter the fundamental nature of a plainly penal statute.” Trop, 356 U.S. at 95, 78 S.Ct. 590 (holding that a statute stripping army deserters of citizenship is a “penal law” despite its codification amidst the regulatory provisions of the “Nationality Act”); see also One Assortment of 89 Firearms, 465 U.S. at 364-65, 104 S.Ct. 1099 (holding a forfeiture provision to be a civil action despite its codification in the state’s criminal code). It follows that the Commonwealth’s authority to regulate voting requirements as part of its civil power does not, in and of itself, establish that Article 120 was intended as a regulatory measure.
Moreover, any inference of legislative intent that could be drawn from the codification of Article 120 in a civil section of *60 Massachusetts’ constitution is undermined by the fact that the Commonwealth was required to amend that constitutional provision, which governs voting qualifications generally, in order to disenfranchise felons. In addition, the subject matter of Article 120 is consistent not only with civil voting requirements, but also with criminal rules imposing an additional deprivation upon persons convicted of particular crimes and in the custody of the criminal justice system. In that sense, Article 120’s broader structure implies both criminal punishment and civil regulation. In sum, neither the language nor the structure of Article 120 betrays a clear regulatory or punitive intent.
Without a clear indication of intended purpose from Article 120 itself, we look to legislative history for evidence of legislative intent.[40] Rolland v. Romney, 318 F.3d 42, 48 (1st Cir.2003). Here, there are two helpful sources of legislative history— public statements made by Massachusetts’ politicians about a series of disenfranchisement proposals that ultimately resulted in Article 120,[41] and the “Information for Voters” Guide (“the Guide”) that was distributed to voters at the law’s ratification stage.
First, the public statements of proponents of the legislation are quite revealing of the punitive motivation behind Article 120. Writing to the Massachusetts Legislature to propose an earlier version of the instant disenfranchisement law, Governor Cellucci argued that “the time has come to tell would-be criminals in Massachusetts that committing crimes has serious consequences.”[42] He advocated for the proposal because it would “ensure that criminals pay their debt to society before they regain their right to participate in the political process.” Governor Cellucci also argued in favor of disenfranchising incarcerated felons because “prisons are a place for punishment.” Striking a similar tone, State Representative Paul Frost argued that prisoners “don’t deserve to vote” and that “this is an issue about justice.” Senator Guy Glodis advocated for the law by stating that “philosophically, no inmates deserve the right to vote.” These comments, reflecting classic punitive rationales, see, infra, section II.B.4 (discussing traditional theories of criminal punishment), provide strong evidence that Article 120 was motivated by an intent to punish felons.
As the majority recognizes, the Guide for voters regarding the ballot question *61 that culminated in the enactment of Article 120, is also relevant to deciphering legislative intent. The Guide stated that the proposal would change the law that “allows criminals to continue to .exercise control over our lives by voting from prison.” The majority found such language to indicate regulatory intent. I disagree. While this language is more ambiguous as to intent than anything else, it suggests to me another retributive statement about what felons “deserve,” i.e. to have their right to participate in government revoked. See id. The Guide also stated that “[a] yes vote will protect democracy’s greatest gift — the right to vote, by reserving it for the law-abiding.” I believe this language is further evidence of the punitive principle of “just desert.” In any event, the ambiguous indications of intent revealed by the Guide do not outweigh the plainly punitive comments by the measure’s proponents.
Confronted with potentially mixed manifestations of legislative purpose — -and I believe such a characterization is generous to the Commonwealth’s position — this court should decipher the law’s “primary function.” See Mendoza-Martinez, 372 U.S. at 169, 83 S.Ct. 554 (emphasis added). Whereas Article 120 itself is unclear as to intent, the Guide is also, at best, ambiguous, and the statements made by Massachusetts politicians are strongly indicative of punitive intent, I find that plaintiffs have made a compelling argument that the weight of the evidence of intent reveals Article 120 to have been intended primarily as a punitive measure. This punitive measure having been applied to plaintiffs retroactively, I believe that an Ex Post Facto violation could be found without further inquiry. But in an abundance of caution, I will proceed.
B. The Effect of Article 120 Is Punitive
Under the second prong of the Smith analysis, even if a clear punitive intent is not discernable for the challenged law, it would nevertheless constitute a criminal punishment subject to the Ex Post Facto Clause if the measure’s effect is so punitive as to negate any intent to deem it civil. Hendricks, 521 U.S. at 361, 117 S.Ct. 2072 (citing Ward, 448 U.S. at 248-49, 100 S.Ct. 2636). The majority correctly explains that, in order to gauge the actual effect of the law, this court reviews the seven factors described in Mendoza-Martinez:
[ (1) ] Whether the sanction involves an affirmative disability or restraint, [ (2) ] whether it has historically been regarded as a punishment, [ (3) ] whether it comes into play only on a finding of scienter, [ (4) ] whether its operation will promote the traditional aims of punishment-retribution and deterrence, [ (5) ] whether the behavior to which it applies is already a crime, [ (6) ] whether an alternative purpose to which it may rationally be connected is assignable for it, and [ (7) ] whether it appears excessive in relation to the alternative purpose assigned.
See Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554 (footnotes omitted). These factors, which are “neither exhaustive nor dispositive,” serve as “useful guideposts.” Smith, 538 U.S. at 97, 123 S.Ct. 1140 (citations omitted).
I agree with the majority that, where the legislature has clearly stated a civil regulatory intent in enacting the challenged sanction, ‘ “only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.” Hudson v. United States, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting Ward, 448 U.S. at 249, 100 S.Ct. 2636). However, I disagree that plaintiffs should be held to that burden, in this case, *62 where the legislative intent is ambiguous at best. The Supreme Court has not resolved this particular question directly. However, where the legislature fails to make its intent clear through express language, or by implication through a law’s broader structure, or even through legislative history, there is strong support for the proposition that a challenged law should be subjected to neutral evaluation when determining its effect. See Mendoza-Martinez, 372 U.S. at 169, 83 S.Ct. 554 (holding that, “[ajbsent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face”); Smith, 538 U.S. at 107, 123 S.Ct. 1140 (Souter, J., concurring) (distinguishing between cases where the legislative intent is clear and those where it is ambiguous, and rejecting the “clearest proof’ burden where it is ambiguous). Accordingly, I would approach the application of the Mendoza-Martinez factors, without any starting presumption, to determine whether the actual purpose or effect of Article 120 is punitive. See Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554. Applying the most relevant of these factors to the inquiry before us, I find that each of them weighs in favor of recognizing Article 120 to be a penal measure subject to the Ex Post Facto Clause.
1. Scienter & Criminality
The third and fifth Mendoza-Martinez factors, “whether the challenged sanction comes into place only on a finding of scienter,” and relatedly, “whether the behavior to which it applies is already a crime,” weigh heavily in favor of concluding that Article 120 is a penal statute. See id. at 168, 83 S.Ct. 554. First of all, “the disciplinary sanction here [is] triggered by a criminal conviction which incorporate^] a finding of criminal intent, and so the disciplinary sanction came into play ‘only on a finding of scienter,’ ” Porter v. Coughlin, 421 F.3d 141, 147 (2d Cir.2005) (quoting Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. 554). Similarly, as Article 120 applies only to persons who have already been convicted of a felony, “the behavior to which it applies is [undoubtedly] already a crime,” as the fifth Mendoza-Martinez factor requires. Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. 554; see also Dep’t of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 781, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (noting that fact that a tax on marijuana was “conditioned on the commission of a crime” is “ ‘significant of [its] penal and prohibitory intent’ ”).
2. History
The second Mendoza-Martinez factor asks whether a particular sanction has “historically been regarded as punishment.” Id. at 168, 83 S.Ct. 554. There is substantial evidence to this effect. First of all, federal courts have frequently characterized felon disenfranchisement as a punitive measure. In its decision in Johnson, the Eleventh Circuit described felon disenfranchisement laws as a “punitive device stemming from criminal law” and explained that “throughout history, criminal disenfranchisement provisions have existed as a punitive device.” See 405 F.3d at 1228 & n. 5. Similarly, the Second Circuit has noted the “nearly universal use of felon disenfranchisement as a punitive device.” Muntaqim v. Coombe, 366 F.3d 102, 123 (2d Cir.2004) (vacated en banc on other grounds). “Congress [has also] recognized the punitive nature of felon disenfranchisement laws.” See Pamela A. Wilkins, The Mark of Cain: Disenfranchised Felons and the Constitutional No Man’s Land, 56 Syracuse L.Rev. 85, 133-34 (2005) (describing how Congressional acts readmitting former Confederate States to the Union did so on the condition that *63 States prohibited disenfranchisement “except as a punishment for ... crimes”). This point is reinforced by renowned historian, Alexander Keyssar’s review of voting rights in this country in which he unequivocally characterizes America’s felon disenfranchisement laws as an intentionally punitive device. Id. (citing Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States 316 (2000)). And the ALI’s Model Penal Code, a compilation examining the penal law of the United States, labels prisoner disenfranchisement “an integral part of the criminal law.” Model Penal Code § 306.3 (Proposed Official Draft 1962). This is strong evidence that, regardless of how a particular disenfranchisement provision is codified, the purpose of disenfranchising felons in American history has been to punish them for their crimes.
There is also substantial evidence, presented by plaintiffs, of the historical use of felon disenfranchisement as a penal mechanism throughout the world. See Hayden, 449 F.3d at 315-16 (describing use of “civil death” laws in Medieval continental Europe, “attainder” laws in medieval England, and “infamy” laws in ancient Greece and Rome, all of which revoked political rights, including the right to vote, “as additional punishment for [certain] crimes”); Keyssar, supra, at 62-63 (“Disenfranchisement for [infamous] crimes had a long history in English, European, and even Roman law, and it [is] hardly surprising that the principle of attaching civil disabilities to the commission of crimes appeared in American law as well.”). Although the district court dismissed this evidence as not relevant to disenfranchisement provisions in American history, that approach misreads this factor as used in Mendoza-Martinez. In fact, in Mendoza-Martinez itself, the Supreme Court explicitly relied on the history of citizenship deprivation in other countries in determining that the challenged law depriving draft evaders of citizenship was punitive in effect. See 372 U.S. at 168 n. 23, 83 S.Ct. 554 (discussing Roman and English societies’ use of forfeiting citizenship as a punishment). Thus, evidence of the historical use of felony disenfranchisement laws both in this country and others is relevant, and both reveal the prevalent historic use of such laws as a penal mechanism.
To refute the extensive evidence that disenfranchisement laws have been historically regarded as punitive, the majority cites one court decision that did not concern the disenfranchisement of felons, Trop. See 356 U.S. at 96-97, 78 S.Ct. 590. Trop does contain dicta suggesting hypothetically that “the purpose of [a felon disenfranchisement statute] is to designate a reasonable ground of eligibility for voting,” id., but as dicta, that language is not binding upon us. See Wilkins, supra, at 102 (arguing that “Trop’s discussion of disenfranchisement statutes was dicta and, therefore, does not excuse judges from the hard work necessary to analyze real disenfranchisement laws”). Trop also explains alternatively, that if “[disenfranchisement] were imposed for the purpose of punishing [an offender], the statute[] would be penal.” 356 U.S. at 96-97, 78 S.Ct. 590. Moreover, that decision says nothing about how such laws have historically been regarded. In any event, the problem with relying on Trop’s suggestion that felon disenfranchisement could be a “reasonable ground of eligibility for voting,” is that Trop fails to reveal what legitimate purpose disenfranchisement serves that would render it a “reasonable ground.” This failure to identify why disqualifying felons is a “reasonable ground” is particularly problematic in light of the fact that both cases cited by Trop for this proposition, Davis v. Beason and Murphy v. Ramsey, involve voting qualifications that *64 are no longer regarded as valid.[43] As several scholars argue, Trop was decided at a time when the government had virtually unrestricted power to regulate the franchise, prior to the Warren’s court’s curtailment of that power when it recognized the fundamental nature of voting rights. See Wilkins, supra, at 102-04; Pamela S. Karlan, Convictions and Doubts: Retribution, Representation, and the Debate Over Felon Disenfranchisement, 56 Stan. L.Rev. 1147, 1150-54 (2004). As such, scholars argue that the dicta in Trop regarding the regulatory nature of felon disenfranchisement laws was premised on an “outdated conception of voting rights,” rendering its continued validity questionable. Wilkins, supra, at 102-04.
Thus, seeing sparse evidence to the contrary, I am persuaded that the evidence cited by plaintiffs of the historical use of disenfranchisement weighs in favor of deeming the practice to be a punitive device.
3. Affirmative Disability or Restraint
In light of this country’s struggle for independence in pursuit of participatory democracy and the centrality attributed to the right to vote in our legal and political culture,[44] I am compelled to conclude that the deprivation of the franchise is an “affirmative disability or restraint” of the gravest sort.
Yet the majority concludes otherwise. In support of its holding that felon disenfranchisement does not constitute criminal punishment, the majority concludes that Article 120 does not impose “any affirmative disability or restraint, physical or otherwise.” To the extent the majority suggests that a restraint need be “physical” in order to resemble a punitive sanction, such a requirement simply does not exist. Rather, Smith discusses physical restraints as only one kind of possible restraint a criminal law might impose. Smith, 538 U.S. at 100, 123 S.Ct. 1140. In fact, our society regularly punishes wrongdoers without actually imposing physical restraints on them, most commonly, with criminal fines. And Supreme Court decisions tasked with applying the Mendoza-Martinez factors to ascertain the penal or regulatory nature of a particular sanction have regularly found non-physical sanctions to be affirmative disabilities or restraints. See, e.g., Kurth Ranch, 511 U.S. at 774, 114 S.Ct. 1937 (holding a tax on illegal drugs to be a punitive measure in part because it “allowed for sanctions by restraint of Debtors’ property”). In fact, Mendoza-Martinez itself held a non-physical sanction, the deprivation of citizenship, *65 to constitute a sanction “essentially penal in character.”
The majority also argues that disenfranchisement during incarceration is not an affirmative disability because it is “not as enduring as permanent occupational debarment.” See Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (holding that revocation of medical license does not violate the Ex Post Facto clause). But revoking a license to practice a particular profession is also not the deprivation of a fundamental right. In holding the revocation of citizenship rights to be punitive in Mendoza-Martinez, the Supreme Court emphasized that it is the “utmost import” and “value” of citizenship rights that renders their deprivation among the gravest of sanctions. Mendoza-Martinez, 372 U.S. at 160, 83 S.Ct. 554. Like citizenship itself, the right to vote, a fundamental component of citizenship, is certainly comparable in its utmost value and importance. Tashjian v. Republican Party, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (noting that the right to vote is a fundamental right inherent in citizenship). It is the importance of the right to vote that renders the gravity of its deprivation so devastating a “disability.” See Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (“The right to vote freely for the candidate of one’s choice is of the essence of a democratic society, and any restrictions on that right strikes at the heart of representativé government.”); Igartúa-De La Rosa v. United States, 417 F.3d 145, 177 (1st Cir.2005) (Torruella, J., dissenting) (“There are few countries in the world in which the right to vote is as exalted as it is in the United States.”); McLaughlin v. City of Canton, 947 F.Supp. 954, 971 (S.D.Miss.1995) (describing disenfranchisement as the harshest sanction imposed by a democratic society and noting that when one is “brought beneath its axe, the disenfranchised is severed from the body politic and condemned to the lowest form of citizenship, where voiceless at the ballot box the disenfranchised, the disinherited must sit idly by while others elect his civic leaders and while others choose the fiscal and governmental policies that will govern him and his family”). Disenfranchisement, though neither physical nor permanent, deprives U.S. citizens of a fundamental right, and as such, is undoubtedly an affirmative disability.
4. Traditional Aims of Punishment
The fourth Mendoza-Martinez factor provides that a sanction is more likely punitive if “its operation will promote the traditional aims of punishment — retribution and deterrence.” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. 554; see also Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (noting that the Supreme Court has established that “[r]etribution and deterrence are not legitimate nonpunitive governmental objectives” (emphasis added)).[45] Of course, the threat of being deprived of a fundamental right will, to a certain extent, always operate to deter a rational person from engaging in unlawful conduct.[46] But as the Supreme *66 Court has recognized, the deterrent effect of a sanction cannot be wholly dispositive of criminal punishment as all civil penalties have some deterrent effect. See Kurth Ranch, 511 U.S. at 777, 114 S.Ct. 1937. It is, however, in its retributive nature that felon disenfranchisement truly reveals its punitive colors. See Karlan, supra, at 1166 (arguing that “disenfranchisement really can be justified only under a retributive theory of criminal punishment”). In this sense, this factor also conclusively weighs in favor of the plaintiffs.
As a form of retribution, “ ‘[pjunishment is the way in which society expresses its denunciation of wrongdoing.’ ” Gregg v. Georgia, 428 U.S. 153, 184 n. 30, 96 S.Ct. 2909, 49 L.Ed.2d 859. The notion is that the offender “owes a debt to society” and “must now atone for his sins by suffering punishment for his transgression.” Peter W. Low et. al., Criminal Law 2 (1982). “This ... conception of punishment ... makes primary the meting out to a responsible wrongdoer of his just deserts.” H.L.A. Hart, Punishment and Responsibility, 158-59 (1968). Other scholars have characterized the retributive aim of criminal punishment as predicated upon the notion of restoring the status quo after an offender, by his contravention of the law, has usurped from his victim or from society generally, something to which he is not fairly entitled. See, e.g., Herbert Morris, Guilt and Innocence, 33-36 (1976) (characterizing punishment as restoring the fair distribution of benefits and burdens that is displaced when a person violates the rules that others have assumed, thereby gaining an unfair advantage); Jean Hampton, Retributivism and Its Critics (1992) (characterizing retributive punishment as a message that restores the prior status hierarchy between victim and offender which was violated by an offender’s degradation of a victim’s worth through criminality).
In the context of the retributive purposes of criminal punishment, it becomes apparent how fundamentally intertwined criminal disenfranchisement laws generally, and Article 120 in particular, are with this punitive objective. The statement from Governor Cellucci’s letter, referenced supra, that the disenfranchisement proposal would “ensure that criminals pay their debt to society” is the textbook articulation of the retributive theory. Similarly, Representative Frost’s statement that felons do not “deserve to vote” is fundamentally linked to the retributive notion of “just deserts.” And Representative Marini’s promise that the law would apply to those who did “despicable things” is consistent with theory of retributive punishment as a means by which society expresses its moral denunciation of unlawful conduct.
Moreover, even the statements contained in the Information for Voters guide, cited by the Commonwealth as evidencing a regulatory non-punitive purpose, in fact, reveal the opposite when considered in the context of criminal punishment theory. For example, the statement that Article 120 would change the law that “allows criminals to continue to exercise control over our lives by voting from prison,” is consistent with Morris’ and Hampton’s notions of retributive punishment as a means of restoring the proper hierarchy between the offender and society, unfairly tipped in the offender’s favor by his desecration of society’s rules. By preventing offenders from benefitting further, at society’s ex *67 pense, through their political participation, disenfranchisement helps to restore that lost equilibrium. Finally, felon disenfranchisement laws, by “denying] the civic and human dignity of persons who have been convicted of doing wrong,” are emblematic of the denunciatory function of criminal law. See Bell, 441 U.S. at 592-93 n. 26, 99 S.Ct. 1861 (Stevens, J., dissenting) (citing letter from Learned Hand to the University of Chicago Law Review).
5. Connection to Non-Punitive Purpose
The sixth Mendoza-Martinez factor asks “whether an alternative purpose to which [the challenged sanction] may rationally be connected is assignable for it.” 372 U.S. at 168-69, 83 S.Ct. 554.
I note, as a threshold matter and as discussed above, that there was no legitimate non-punitive purpose expressly assigned to Article 120, and that the purpose of the statute as revealed by its legislative history is primarily punitive. But even if we were to speculate as to non-punitive rationales potentially assignable to the provision, I simply cannot agree with the majority that there is an “obvious rational non-punitive purpose for disenfranchisement.” The reality is that “[c]ourts have been hard pressed to define the state interest served by laws disenfranchising persons convicted of crimes.” Dillenburg v. Kramer, 469 F.2d 1222, 1224-25 (9th Cir.1972) (“Appellee does not explain why disenfranchisement of those convicted of offenses that can result in confinement in state prison is ‘necessary’ to vindicate any identified state interest.”); see also Stephens v. Yeomans, 327 F.Supp. 1182, 1188 (D.N.J.1970) (striking down New Jersey felon disenfranchisement law because court “perceivefd] no rational basis for the ... classification” of felons as a group that could not vote).
My reading of the legislative history of Article 120, much of which indicates a punitive motivation, and the lack of a sufficient rational nexus to any non-punitive purpose, suggest that any purported regulatory motivations are, in fact, disingenuous. Moreover, the potential non-punitive rationales for felon disenfranchisement are, in many cases, now regarded as illegitimate grounds for restricting the vote, and as such, should not be credited. See Trop, 356 U.S. at 96, 78 S.Ct. 590 (holding that a statute is non-penal “if it imposes a disability, not to punish but to accomplish some other legitimate governmental purpose.” (emphasis added)). That leaves criminal punishment as the only legitimate discernible “legislative aim” behind Article 120. I will consider, in turn, the various non-punitive justifications potentially assignable to Article 120 and explain why each cannot be rationally assignable to it.
First, the majority suggests that the “obvious rational non-punitive purpose for disenfranchisement” is the concern about felons “exercising] control over [people’s] lives by voting from prison.” But as explained supra, this concern actually boils down to the punitive sentiment that felons do not “deserve” to do so.
Second, the Commonwealth argues, on appeal, that the purpose of Article 120, evidenced by its placement alongside other valid voter qualifications in the Massachusetts constitution, was to exempt from the franchise those persons “deem[ed] unfit to vote,” such as minors, persons under guardianships, and persons convicted of corrupt election practices. That argument rests on the principle that, due to their lack of respect for the criminal law, felons, like minors and mentally incompetent persons, “have raised questions about their ability to vote responsibly,” and therefore, “cannot be trusted” to do so. Given the absence of any reference to voter “compe *68 tence” in the legislative history of Article 120, and the weak connection between disenfranchising incarcerated felons and the alleged interest in responsible voting, I am inclined to dismiss this explanation as a pre-textual rationale masking a punitive purpose. See Hendricks, 521 U.S. at 371, 117 S.Ct. 2072 (Kennedy, J., concurring) (“If the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish.”). This is because disenfranchising felons is both under and over-inclusive of this alleged rationale. It is under-inclusive because if persons who violate the law have shown that they cannot vote responsibly, then not only incarcerated felons, but all persons who commit any kind of crime should be disenfranchised, whether they are serving a custodial sentence or not. Moreover, all citizens who for any reason have shown themselves to be irresponsible voters should be disenfranchised as well. It is over-inclusive because some incarcerated felons, despite their prior transgressions, may have, through the rehabilitative elements of their sentence, developed great respect for society’s rules. While it is true that “[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the non-punitive aims it seeks to advance,” Smith, 538 U.S. at 102-03, 123 S.Ct. 1140 (emphasis added), the connection here seems especially attenuated, especially in light of the fundamental right that is at stake. This suggests that the concern with felons being “unqualified” is “simply a fictional concern advanced to mask a punitive purpose.” United States v. Brown, 381 U.S. 437, 446-47, 85 S.Ct. 1707, 14 L.Ed.2d 484 (White, J., dissenting).
More importantly, I question whether the Commonwealth can rely on a felon’s purported incapacity to vote responsibly as the “non-punitive rationale” for Article 120 given that neither the ability to vote responsibly nor respect for the existing law remain “reasonable ground[s] of eligibility for voting.” See Trop, 356 U.S. at 96-97, 78 S.Ct. 590. Rather, the idea that a particular group may be disqualified from voting based on a lack of respect for existing criminal law now constitutes a form of viewpoint discrimination that has been expressly rejected. See, e.g., Romer, 517 U.S. at 634, 116 S.Ct. 1620 (see parenthetical, supra, n. 43); Dunn v. Blumstein, 405 U.S. 330, 354-56, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (rejecting durational residency requirements that rested on claims about the desirability of ensuring that citizens understood, and shared, community values before they were permitted to vote); see also Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (“ ‘Fencing out’ from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.”). Thus, according to one scholar, “contemporary voting rights doctrine casts a serious shadow on the central traditional non-penal justification for felon disenfranchisement: the claim that ex-offenders should not be permitted to vote because they lack the qualities of mind or character voters ought to possess.” Karlan, supra, at 1152.
Third, a similar analysis applies to the purported non-punitive “regulatory” purpose arbitrarily assigned to Article 120 by the district court. The district court suggested that prisoners are somehow unqualified to participate in the “participatory and collegial process” of “representative democracy” because they “have limited access to information and little opportunity to discuss issues with individuals who are not also being punished for breaking the law.” Not only is this “inability-to-become-informed” rationale entirely absent *69 from the discussions motivating the enactment of Article 120, but it is simply not rationally connected with disenfranchising the entire convicted felon population, many of whom may very well have access to newspapers, media, and contact to outside visitors, as well as the leisure time to become politically informed, and thereby, even more knowledgeable voters than law-abiding persons on the “outside.” But again, and more importantly, the Supreme Court has consistently rejected restrictions on the franchise in order to further “knowledgeable or intelligent voting.” See, e.g., Dunn, 405 U.S. at 356, 92 S.Ct. 995. Thus, “[i]f neither good character nor intelligent use of the ballot nor support for existing criminal laws are generally permissible prerequisites for voting, then it would be perverse to rely on criminal convictions as evidence that individuals lack qualities that voters are not required to have.” Karlan, supra, at 1155. “The obvious alternative is to conclude that disenfranchisement is indeed punitive and that if it is to be justified, it must be justified as a legitimate form of punishment, rather than as a species of political regulation.” Id.
Finally, that this “alternative purpose” factor of the Mendozar-Marbinez analysis weighs in favor of deeming Article 120 a punitive sanction is bolstered by examining what has been found to constitute a “legitimate non-punitive purpose” in prior Mendoza-Marbinez cases, and what has not. That examination reveals that those cases holding particular sanctions to constitute non-punitive regulatory measures have served far clearer and more substantial societal interests than the attenuated justifications provided for felon disenfranchisement. For example, in Hendricks, the state civil commitment law held to be non-punitive was intended to protect the public from dangerous mentally ill persons “likely to engage in ‘predatory acts of sexual violence.’ ” 521 U.S. at 350, 117 S.Ct. 2072. Similarly, Alaska’s sexual offender registration requirement, held to be non-punitive in Smith, had the express purpose of “protecting the public from sex offenders” who “pose a high risk of reoffending.” 538 U.S. at 93, 123 S.Ct. 1140; see also United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding that preventative detention under Bail Reform Act, justified by the need to prevent “danger to the community,” was regulatory and preventative, rather than punitive).
On the other hand, the provision being challenged before us bears a far greater resemblance to the one at issue in Mendozar-Marbinez itself. In Mendoza-Martinez, where “there was no reference to the societal good that would be wrought by the legislation,” the Supreme Court concluded that “the obvious inference” was that “Congress was concerned solely with inflicting effective retribution upon this class of draft evaders and, no doubt, on others similarly situated.” Mendoza-Martinez, 372 U.S. at 182, 83 S.Ct. 554; see also Trop, 356 U.S. at 97-98, 78 S.Ct. 590 (holding that statute stripping military deserters of citizenship rights cannot rationally be treated other than as a penal law). Finding no legitimate non-penal interest served by the legislation, the Supreme Court in Mendozar-Marbinez did not go on to speculate as to potential alternative justifications. But even if it had, the conceivable legitimate non-penal justification for stripping an American of his citizenship rights for violating a criminal statute prohibiting the evasion of military service, as in Mendozar-Marbinez and Trop, is no more substantial than the conceivable justifications for stripping a U.S. citizen of an essential component of those rights (i.e. voting), for violating another criminal statute. Of course, one could argue that by abandoning the obligations of *70 citizenship by evading the military obligations attendant thereto, a person shows that he . is not “competent” to exercise the benefits and burdens of citizenship, just like one could argue that a person who breaches the criminal law shows that he is not competent to exercise the responsibility of aiding in its enactment. But the Supreme Court has refused to make this leap, and neither should we here. Given the similarities between the respective sanctions[47] — deprivation of citizenship and deprivation of voting rights — the lack of any clear non-punitive interest for either sanction, and the similar triggering event for the imposition of each, namely, violation of a criminal law, I think we are compelled by Mendozctr-Martinez to hold Article 120 to be a penal measure. Finding Article 120 to be a penal measure, its constitutionality is subject to the constraints of the Ex Post Facto Clause, and violates that clause as retroactively applied to the plaintiffs.
To be abundantly clear, I see nothing constitutionally impermissible about disenfranchising felons as a form of criminal punishment. Criminals who are convicted of serious offenses pursuant to a legitimate process are properly deprived by the state of a panoply of fundamental individual and civil rights. But “punishment” must be labeled what it is, and imposed only in compliance with the time-honored constitutional guarantees that legitimate the exercise of that practice. Central among these guarantees is the prohibition against the enactment of ex post facto laws. As Article 120 inflicts a greater punishment upon convicted felons than the law annexed to their crimes when committed, see Calder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648 (1798), I would invalidate its retroactive application. Thus, I would reverse the decision of the district court as to the ex post facto claim, and order that judgment be entered for plaintiffs.
For the reasons herein stated, I respectfully dissent.

. Compare Farrakhan v. Washington, 338 F.3d 1009 (9th Cir.2003) (holding that § 2 of the VRA applies to felon disenfranchisement statutes); Johnson v. Governor of Fla., 353 F.3d 1287 (11th Cir.2003) (same); Baker v. Cuomo, 58 F.3d 814 (2d Cir.1995) (same); Howard v. Gilmore, No. 99-2285, 2000 WL 203984, at *1 (4th Cir. Feb.23, 2000)(assuming without expressly deciding that § 2 of the VRA applies to felon disenfranchisement laws and evaluating plaintiffs vote dilution claim thereunder); Wesley v. Collins, 791 F.2d 1255 (6th Cir.1986) (same) with Hayden v. Pataki, 449 F.3d 305 (2d Cir.2006) (en banc) (reversing its previous decision and denying coverage under the § 2 of the VRA for felon disenfranchisement statutes); Johnson v. Governor of Fla., 405 F.3d 1214 (11th Cir.2005) (en banc) (same); Baker v. Pataki, 85 F.3d 919 (2d Cir.1996) (en banc) (dividing evenly on the question of whether felon disenfranchisement claim can proceed under § 2 the VRA, thus reinstating the district court decision dismissing the claim).

. Among the non-exhaustive factors listed by the Senate as relevant to assessing the validity of a voter qualification is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." S.Rep. No. 94-417, at 29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 207. The ultimate inquiry, according to the Senate Report is "whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic] choice.” Id. at 30. The Ninth Circuit, applying this test, has explicitly held that evidence of racial bias in the criminal justice system is a relevant "social and historical condition” for pur *47 poses of the totality of the circumstances test, reasoning that "such discrimination would clearly hinder the ability of racial minorities to participate effectively in the political process as disenfranchisement is automatic.” Farrakhan, 338 F.3d at 1020; see also Nipper v. Smith, 39 F.3d 1494, 1513-14 (11th Cir.1994) (en banc) (holding that the existence of racial bias in the community is relevant to a § 2 claim). "Thus, racial bias in the criminal justice system may veiy well interact with voter disqualifications to create the kinds of barriers to political participation on account of race that are prohibited by Section 2.” Farrakhan, 338 F.3d at 1020.

. Notably, bearing on the question of plausibility of plaintiffs’ claim, one scholar has found that an analysis of the factors inducing states to impose or eliminate felon disenfranchisement provisions concluded that "[sjtates with greater nonwhite prison populations have been more likely to ban convicted felons from voting than states with proportionally fewer non-whites in the criminal justice system.” Angela Behrens, et al., Ballot Manipulation and the "Menace of Negro Domination”: Racial Threat and Felon Disenfranchisement in the United States, 1850-2002, 109 Am. J. Soc. 559, 596 (2003).

. The majority attempts to distinguish Farrakhan on the ground that the Washington provision at issue in that case was "not as narrow as this one." I, however, see no meaningful difference between disenfranchising felons until the completion of their sentences as under the Washington statute, or only while incarcerated, as in the case before us. In any event, the narrowness or breadth of a particular felon disenfranchisement scheme bears no relevance upon the question of whether challenges to these types of laws are cognizable under the VRA.

. We acknowledge that § 2(b) of the VRA, containing a "totality of the circumstances” test for proving a violation of § 2(a), may require further interpretation. However, any ambiguity in § 2(b) is irrelevant to whether a felon disenfranchisement provision is a voting qualification governed by the Act-a question which the plain language of § 2(a) unambiguously answers in the affirmative. See Robinson, 519 U.S. at 340, 117 S.Ct. 843 (identifying the relevant question as "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." (emphasis added)).

. Notably, despite its insistence on resorting to secondary sources to ascertain congressional intent, the majority places curiously little emphasis on the historical and policy considerations that prompted Congress to pass into law the very statute whose meaning it endeavors to ascertain.

. Indicative of Congress's intent to give this prophylactic statute the broadest possible scope, it is notable that an earlier draft of § 2(a) used the slightly narrower language "qualification or procedure,” but during Senate Hearings on the bill, one Senator expressed concern that the word ‘procedure’ was not broad enough to cover all the various practices that might effectively be employed to deny citizens their right to vote. See Allen, 393 U.S. at 566-67 & n. 8, 89 S.Ct. 817 (citing legislative history). In response, the Attorney General said he had no objection to expanding the language of the section, to be all-inclusive. Id. Congress then expanded the language in the final version of § 2 to include any " 'voting qualifications or prerequisite to voting, or standard, practice, or procedure.’ ” Id. (quoting 42 U.S.C. § 1973 (1964)).

. In fact, in his concurrence in Holder v. Hall, Justice Thomas acknowledged that § 2 of the VRA was broadly phrased "with an eye to eliminating the possibility of evasion.” 512 U.S. 874, 917, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (Thomas, J., Concurring). Although Justice Thomas argued for a more restrictive interpretation of the scope of § 2 than the majority of the Supreme Court had recognized, his more restrictive interpretation of the provision was as follows:
[T]he specific items described in § 2(a) ... indicate that Congress was concerned in this section with any procedure, however it might be denominated, that regulates citizens' access to the ballot — that is, any procedure that might erect a barrier to prevent the potential voter from casting his vote.
Id. (emphasis added). Surely, felon disenfranchisement laws, which outright bar a segment of the population from voting, fall into this expansive category.

. See also George Brooks, Comment, Felon Disenfranchisement: Law, History, Policy and Politics, 32 Fordham Urb. L.J. 851, 858 (2005) (noting that "[fjelon disenfranchisement was sometimes used as a tool by the states to disenfranchise blacks” and citing examples of states passing laws “disenfranchising those convicted of what were considered to be 'black' crimes, while those convicted of ‘white’ crimes did not lose their right to vote”); Virginia E. Hench, The Death of Voting Rights: The Legal Disenfranchisement of Minority Voters, 48 Case W. Res. L.Rev. 727, 738 (1998) (describing how, during Reconstruction, in an effort to prevent African-Americans from voting, several states enacted felon disenfranchisement laws and "carefully selected disenfranchising crimes in order to disqualify a disproportionate number of black voters” and noting that "many of today's laws disenfranchising felons can trace their roots to attempts by Reconstruction constitutional conventions to enact laws that would keep black voters out of the electoral process”).

. See, e.g., Shapiro, supra, at 543; Brooks, supra, at 858; Hench, supra, at 738.

. In relevant part, that provision states as follows:
Representatives shall be apportioned among the several States according to their respective numbers,.... But when the right to vote ... is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.
U.S. Const. amend. XIV, § 2.

. In fact, the majority’s contrary interpretation of § 2 of the Fourteenth Amendment, i.e. that felon disenfranchisement is constitutionally protected and cannot be restricted, would result in a direct conflict between constitutional directives in that it is well-established *54 that a felon disenfranchisement statute intended to discriminate against minorities are prohibited under § 1 of the Fourteenth Amendment. See Hunter v. Underwood, 471 U.S. 222, 229, 105 S.Ct. 1916, 85 L.Ed.2d.222 (1985) (holding Alabama’s disenfranchisement for commission of petty crime or misdemeanor provision unconstitutional). The only reading of § 2 that respects the validity of Hunter and similar precedent is one that permits states to disenfranchise felons only where federal law does not otherwise preclude them from doing so.

. While this rule, known as the expressio unius est exclusio alterius canon of construction, see Councilman, 418 F.3d at 73-74, is useful for evaluating the import of omissions and inclusions in statutory text, I believe its principle is equally persuasive with respect to express omissions and inclusions in the legislative history of a statute.

. See Gabriel J. Chin, Are Collateral Sanctions Premised on Conduct or Conviction?, 30 FordhamUrb. L.J. 1685, 1686 (2003) (opining that “it is not always clear that the primary legislative motivation for a collateral sanction is civil rather than punitive, nor is it always a simple matter to discern the primary motivation”).

. For an example of the kind of clear language "express[ing] the objective of [a] law in the statutory text itself,” see Smith, 538 U.S. at 93, 123 S.Ct. 1140 (citing the Alaska Legislature’s public safety interest in "protecting the public from sex offenders” as the basis for its sex offender registration provision).

. It is surprising that, given its extensive reliance on statements in the legislative history to analyze the clear statutory language of the VRA, the majority only mentions legislative history briefly in its Ex Post Facto Clause analysis, even though the language and structure of Article 120 is actually ambiguous as to whether Article 120 was intended to be punitive or regulatory. While the majority states that it will consider certain comments made by Governor Cellucci, it never analyzes these or other comments by Article 120's proponents relevant to the legislative history of the provision.

. The legislative process resulting in the passage of Article 120 is worth noting. A constitutional amendment initiated by a legislator must be approved by two successive joint sessions of the Massachusetts legislature and then ratified by Massachusetts voters. Commonwealth Mass. Const. Art. 49, Init., pt. IV, §§ 2-5.

. I agree with the majority that, even though earlier proposals for felon disenfranchisement laws did not pass, their legislative histories are relevant here. These earlier proposals are nearly identical to Article 120, so the motivation for them is relevant evidence for the motivation behind Article 120. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 180, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (using the legislative history of earlier legislation when assessing the motivation of a law "quite obviously patterned on that of its predecessor”).

. See Romer v. Evans, 517 U.S. 620, 634, 116 S.Ct 1620, 134 L.Ed.2d 855 (1996) (holding that the decision of the Court in Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), which upheld the disenfranchisement of polygamists on grounds that they advocate "practical resistance to the laws of the Territory” and "approve the commission of crimes forbidden by it” is "no longer good law” because "persons advocating a certain practice may [not] be denied the right to vote”). Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885), involved a suit similar to Davis in which the Supreme Court upheld a voting qualification disqualifying any "polygamist, bigamist, or any person cohabiting with more than one woman ...” from voting in Utah. Id. at 38, 42-43, 5 S.Ct. 747. Though Murphy was not expressly overruled by name, as was Davis in Romer, it is evident, given the similarity between the Davis and Murphy challenges, that neither decision continues to represent valid law. The rejection of this line of cases suggests that keeping "undesirable” persons, including felons, from voting is no longer a valid regulatory purpose.

. See Werme v. Merrill, 84 F.3d 479, 482 (1st Cir.1996) ("It is apodictic that the right to vote is a right that helps to preserve all other rights.”).

. See also Wilkins, supra, at 133 & n. 316 (noting that in his history of American suffrage, Alexander Keyssar characterized felon disenfranchisement laws as intentionally punitive, noting that "disenfranchisement, whether permanent or for an extended period, serves as retribution for committing a crime and as a deterrent to future criminal behavior”).

. That some of Article 120's proponents considered this possibility is evident from statements such as that of Governor Celucci in his letter in support of the disenfranchisement amendment:
The time has come to tell would be criminals in Massachusetts that committing crimes has serious consequences, not only *66 in terms of prison time, but also in terms of the right to participate in deciding how society should be run.
(Emphasis added). This language suggests that the proposal was intended to deter "would be” criminals from committing crimes.

. See Nw. Austin, 557 U.S. at -, 129 S.Ct. *2511 (describing "the right to vote" as "one of the most fundamental rights our citizens”); Tashjian, 479 U.S. at 217, 107 S.Ct. 544; Wolfish, 441 U.S. at 589-90 & n. 22, 99 S.Ct. 1861 (Stevens, J. dissenting) (noting that ”[t]he withdrawal of rights is itself among the most basic punishments that society can exact, for such a withdrawal qualifies the subject’s citizenship and violates his dignity” and citing disenfranchisement as the "classic example of the coincidence of punishment and the total deprivation of rights”).